**Electronically Filed
Intermediate Court of Appeals
30205
12-OCT-2012
08:37 AM**

NO. 30205

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
MARYANN ACKER, Defendant-Appellant
and
WILLIAM GERALD ACKER, Defendant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 056042)


MEMORANDUM OPINION
(By: Nakamura, Chief Judge, and Foley and Reifurth, JJ.)

Defendant-Appellant Maryann Acker, now known as Maryann Bray (Maryann), was convicted on retrial of the murder of Lawrence Hasker (Hasker). She was sentenced to life imprisonment, with the possibility of parole, by the Circuit Court of the First Circuit (Circuit Court).[1]

On appeal, Maryann argues that she was denied her right to a fair trial because: (1) the Circuit Court erred in ruling that, during her cross-examination of her ex-husband William Acker (William), she had opened the door to the admission of "bad acts" evidence concerning her involvement with William in the murder of Cesario Arauza (Arauza); (2) the testimony of Timothy Millard (Millard), Hasker's friend, concerning a police request that Millard take a lie detector test was an "evidentiary

---

[1] The Honorable Michael A. Town presided over Maryann's retrial.

harpoon" requiring a mistrial; (3) the prosecutor improperly cross-examined Maryann using information in her presentence report; (4) the Circuit Court mishandled William's refusal to testify when he was recalled as a witness in the defense case; and (5) the prosecutor engaged in misconduct in closing argument. Maryann also argues that the Circuit Court's jury instructions regarding the offense of murder and accomplice liability were erroneous. We affirm.

BACKGROUND

This appeal concerns the retrial of Maryann for the murder of Hasker. The indictment charged Maryann with committing the murder of Hasker between on or about June 18, 1978, and June 20, 1978, in violation of Hawaii Revised Statutes (HRS) § 707-701 (1976).[2] On June 23, 1978, Hasker's dead body was discovered at Hanauma Bay. The cause of death was a gunshot wound to the head. Other incidents that are relevant to Maryann's retrial include the kidnaping and robbery of Joe Leach (Leach) on June 10, 1978, and the murder of Arauza in California on June 25, 1978. At the time of Hasker's murder and the Leach and Arauza incidents, Maryann was married to William.

I.    The Arauza Case

After Hasker was murdered, William and Maryann left Hawai'i and went to California. Within a week after Hasker's murder, Arauza's dead body was found. On June 28, 1978, Maryann was arrested while she was driving Arauza's car. William later turned himself in to California authorities on July 1, 1978.

On July 20, 1978, William and Maryann were charged by California authorities with the murder of Cesario Arauza. The murder charge alleged that on or about June 24, 1978, William and Maryann "did willfully, unlawfully, and with malice aforethought" murder Arauza. The murder charge further alleged that in the commission of this offense, William and Maryann "personally used

_____

[2] At the time relevant to this case, HRS § 707-701 provided, in relevant part, that "a person commits the offense of murder if he intentionally or knowingly causes the death of another person."

a firearm, to wit a 38 calibre revolver, within the meaning of Penal Code Section 12022.5." California authorities also charged Maryann with committing three robberies and charged William with committing two robberies.

The cases against William and Maryann were severed for trial. After a jury-waived trial, Maryann was found guilty of the murder of Arauza, but the court found the use of firearm allegation to be "not true" and ordered that allegation stricken. Maryann was also convicted of three robberies. William later pleaded nolo contendere to the murder of Arauza and the use of firearm allegation. He also pleaded guilty to two robberies. He was sentenced to life imprisonment with the possibility of parole. The California judgments of Maryann and William were filed in July 1979.

II. Maryann's First Trial in Hawai'i

After William and Maryann had been convicted and sentenced on the California charges, they were indicted in Hawai'i. In an indictment filed on August 19, 1981, Plaintiff-Appellee State of Hawai'i (State) charged Maryann with: kidnapping Leach (Count I); robbing Leach (Count II); exerting unauthorized control over Leach's car (Count III); kidnapping Hasker (Count IV); robbing Hasker (Count V); murdering Hasker (Count VI); exerting unauthorized control over Hasker's car (Count VII); and buglarizing Hasker's residence (Count VIII). The crimes against Leach were alleged to have occurred on or about June 10, 1978, and the crimes against Hasker "on or about the 18th day of June, 1978, through and including the 20th day of June, 1978." The murder count charged that "[Maryann] did intentionally or knowingly cause the death of Lawrence R. Hasker by shooting him with a firearm."

William was also charged in the indictment with the same offenses as Maryann, except that he was not charged with the murder of Hasker. Pursuant to a plea agreement, William pleaded guilty to robbing Hasker as charged in Count V; he was granted

3

transactional immunity for his testimony against Maryann; and the other charges against him were dismissed.

William subsequently testified as a prosecution witness at Maryann's first trial on the Hawai'i charges. Through William's testimony, the prosecution was permitted to present evidence of Maryann's involvement in the murder of Arauza. William testified that Maryann had shot and killed both Hasker and Arauza. With respect to Arauza, William testified that Arauza had picked up William and Maryann as they were hitchhiking. According to William, after stopping at a rest area that had a restaurant, Maryann and Arauza left William behind and drove off in Arauza's car. Maryann returned alone in Arauza's car about twenty to thirty minutes later, and she told William that she had left Arauza on an on-ramp. William stated that in February 1979, long after they had been charged with Arauza's murder, Marryann told him that she had shot Arauza.

William also testified that based on his understanding of the felony murder rule, he decided to enter his plea to the murder of Arauza even though Maryann had shot and killed Arauza. Through his testimony, William suggested that he had pleaded guilty or nolo contendere to felony murder with respect to Arauza, whereas he actually pleaded nolo contendere to murder and the use of firearm allegation. The State also did not disclose to the defense that William had been sentenced to life imprisonment with the possibility of parole for the Arauza murder.

The jury found Maryann guilty as charged on all counts. The Circuit Court sentenced Maryann to a term of life imprisonment, with the possibility of parole, and a mandatory minimum term of term of ten years on the Count VI murder conviction; five years of imprisonment on Counts III and VII; ten years of imprisonment on Counts I and VIII; and twenty years of imprisonment on Counts II, IV, and V, all terms to be served concurrently.

4

On June 2, 1982, Maryann filed a direct appeal of her convictions. As one of the points of error in her opening brief, Maryann asserted that "[t]he trial court erred in permitting evidence of [Maryann's] prior crimes." Maryann's brief argued that

> the Arauza case was not relevant to establish any of the exceptions to Rule 404. It did not prove motive . . . [i]t did not prove opportunity . . . [i]t did not prove preparation or plan . . . [i]t did not prove intent, knowledge, or absence of mistake or accident . . . [i]t did not establish identity . . . [and] [f]inally, it did not prove modus operandi. . . .
>
> Assuming _arguendo_ that one or more exceptions were relevant, the prejudice against [Maryann] far outweighed any probative value in view of the issues and the evidence available to the State.

On December 11, 1984, the Hawai'i Supreme Court issued a Memorandum Opinion affirming Maryann's convictions. State v. Acker, No. 8745 (Hawai'i Dec. 13, 1984). The supreme court's Memorandum Opinion states: "This is an appeal from a conviction for murder. Numerous grounds are argued by [Maryann] on appeal. On a review of the record, we find no merit to any of them. Affirmed."

### III. Maryann's Hawai'i Rules of Penal Procedure (HRPP) Rule 40 Petition

Maryann filed a Petition for Post-Conviction Relief pursuant to HRPP Rule 40 on August 15, 2000, an Amended Petition for Post-Conviction Relief on May 13, 2002, and supporting memoranda and exhibits (collectively, "Rule 40 Petition"). In her Rule 40 Petition, Maryann alleged, among other things, that: (1) her conviction for murder should be dismissed or a new trial held on this charge because William admitted during his May 2, 1991, California parole hearing that he was solely responsible for the murder in Hawai'i; and (2) her right to a fair and impartial trial had been violated by the suppression of information favorable to her that the State was required to disclose under Brady v. Maryland, 373 U.S. 83 (1963), namely, that William had pleaded nolo contendere to first degree murder

with the use of a firearm in California and had been sentenced to life imprisonment with the possibility of parole for that offense.

The Circuit Court[3] filed a Decision on January 21, 2005, and amended findings of fact and conclusions of law and order on March 7, 2005, which granted Maryann's Rule 40 Petition as to her claim regarding the prosecution's failure to disclose evidence about William's prior conviction and sentence. The Circuit Court vacated Maryann's convictions and ordered that she receive a new trial. The State appealed. This court affirmed the Circuit Court to the extent that it vacated Maryann's murder conviction on Count VI and ordered a new trial on that count. Acker v. State, No. 27081, 2007 WL 2800803 (Hawai'i App. Sept. 27, 2007) (SDO).[4]

IV.  Maryann's Retrial

A.  Pretrial rulings

Prior to Maryann's retrial, the State filed a notice of its intent to introduce evidence of the Leach robbery in Hawai'i and the Arauza murder in California. Maryann opposed the State's use of this evidence. The Circuit Court ruled that it would allow the State to introduce evidence of the Leach robbery, but that it would not allow the State to introduce evidence of Maryann's complicity in the murder of Arauza in the State's case-in-chief. The Circuit Court acknowledged that the Hawai'i Supreme Court had upheld the State's introduction of the Arauza evidence at Maryann's first trial. The Circuit Court, however, declined to apply the "law of the case" doctrine to the Arauza evidence because it found cogent reasons for modifying the prior ruling.

_____

[3] The Honorable Michael A. Town presided.

[4] We further held that the Circuit Court had erred to the extent it vacated and set aside Maryann's other convictions, and we remanded the case so that the non-murder convictions would be reinstated. Acker v. State, No. 27081, 2007 WL 2800803 (Hawai'i App. Sept. 27, 2007).

Although ruling in Maryann's favor in excluding the Arauza evidence, the Circuit Court warned defense counsel that Maryann may open the door to the Arauza evidence through her cross-examination of William:

> THE COURT: . . . . What worries me is if William Acker gets on the stand and says he is pure as the driven snow and he has constantly told the truth, we're going to get into whether or not he lied in this Court [at the first trial] . . . 26 years ago . . . .
>
> [Defense counsel]: Yes.
>
> THE COURT: And whether he -- or whether he lied up in California and pled to being the shooter. And we'll get to that. But if the door is opened, we're going to have to go down that road, Mr. [Defense counsel]. Fair enough?
>
> [Defense counsel]: Fair enough, Judge.

Maryann filed a "Third Motion in Limine" to preclude the State from calling William as a witness on the ground that "the State is aware that [his] testimony is false," or alternatively, to permit Maryann to introduce evidence that William had failed a polygraph examination. In support of this motion, defense counsel asserted that: (1) William was found to be deceptive during a polygraph examination by the Honolulu Police Department; (2) William had falsely testified at Maryann's first trial that he had pleaded nolo contendere to felony murder regarding Arauza, rather than nolo contendere to murder and the use of firearm allegation; and (3) at William's 1991 California Parole Board hearing, William stated under oath that he had been the shooter in both the Hasker and Arauza murders. At this 1991 Parole Board hearing, William was questioned by a California parole commissioner and answered as follows:

> Q: Okay. Then answer me this: Did you commit the murder for which you're in custody [(the Arauza murder)]?
>
> A: Yes, I did.
>
> Q: Did you pull the trigger?
>
> A: Yes, I did.
>
> Q: What about the one in Hawaii?

7

A:    I committed them all and I want the woman behind it [(referring to Maryann)], the woman that's incarcerated, I would like her set free.

Q:    Okay.  So Marianne (phonetic) didn't do anything?

A:    Nothing.  Absolutely nothing.

Q.    And this is the first time you've said that?

A:    The very first time.

The Circuit Court held hearings on Maryann's Third Motion in Limine and also considered whether Maryann would be permitted to cross-examine William about his 1991 statements to the California Parole Board.  The State argued that if Maryann attempted to cross-examine William about these statements, it would open the door to the Arauza matter, which the Circuit Court had ruled was inadmissible.  The State proffered that William would testify that he falsely took responsibility for being the shooter in the Hasker and Arauza murders because he was told by Maryann's attorney that the California Parole Board would "let [Maryann] out" if he made these statements.  The State argued that William should be allowed to explain why he falsely took responsibility for being the shooter and that this would necessarily require getting into the Arauza case.

At the initial hearing, the Circuit Court indicated that if Maryann cross-examined William with his statements to the California Parole Board, it would "probably" open the door to the Arauza evidence.  The Circuit Court warned defense counsel that if "we get into [the statements to the Parole Board], I'm probably going to let [William] give his reasons in his head why he did it[.]"  It also advised defense counsel to "be prepared" for the possibility that the door to the Arauza matter could be opened.

At a subsequent hearing, the Circuit Court again took up the issue of whether cross-examining William on his statements to the California Parole Board would open the door to the Arauza matter, and defense counsel acknowledged his understanding that

such cross-examination may result in opening the door. Defense counsel noted his understanding that if he attempted to use William's statements before the California Parole Board to show that William "committed perjury" at Maryann's first trial when he testified she had been the shooter, "then the door could be opened." Defense counsel stated:

> [I]f I can't bring in the fact of [William's] reputation and his admission of perjury, then I don't think I'm doing my job. If the Court says that by bringing that in, I open the door, then so be it, but if that's what happens, that's what happens.

The State again argued that cross-examining William about his statements to the California Parole Board would necessarily open the door to the Arauza matter, which prompted the following responses from the Circuit Court and defense counsel:

> THE COURT: That makes sense to me. How are we going to get around that, the California situation?
>
> [Defense counsel]: If California comes in, California comes in for the whole thing, Judge. I'm not trying to -- I'm not trying to, you know, just nip and tuck things. If it comes in, it comes in.

At the end of the discussion on this point, defense counsel agreed with the prosecutor's understanding of the Circuit Court's ruling.

> [Prosecutor]: Just to clarify, the only way then that California should come in, if at all, through [defense counsel] is if he confronts William Acker with his statement to the paroling authority at which point I get to bring in evidence of [Maryann's] conviction because that goes to his reason why he said that -- made that statement.
>
> [Defense counsel]: That's my understanding.
>
> THE COURT: Fair enough. Makes sense . . . .

The Circuit Court denied Maryann's motion in limine to preclude William from testifying and her alternative request to permit the introduction of evidence that William had failed a polygraph examination. With respect to Maryann's cross-

examination of William, the Circuit Court entered a written order which stated:

> [Maryann] may question William Acker on his 1991 statement to the California Parole Board, subject to proper foundation being laid.
>
> IT IS FURTHER ORDERED that should [Maryann] question William Acker on his 1991 statement to the California Parole Board, the State may then introduce evidence of William Acker's reasons for making that statement, including [Maryann's] conviction and sentence for the murder of Cesario Arauza in California.

## B.  Trial evidence

### 1.

At trial, the State presented evidence that Hasker's body was found on June 23, 1978, in shrubbery off the side of the road at Hanauma Bay.  The cause of death was a gunshot wound to the head.  Hasker had also been shot in the lower left leg. Hasker's sister, who had been sharing an apartment with him, testified that she last saw her brother on June 19, 1978.  When she later returned to the apartment, it was in disarray and cash and jewelry were missing.

### 2.

William testified as a witness for the State.  William stated that pursuant to a plea agreement with the State, he had pleaded guilty to robbing Hasker, and all other charges against him were dropped.  William had testified at Maryann's prior trial and had been granted immunity for this testimony.  William had been sentenced to twenty years of imprisonment in Hawai'i and had completed his sentence.

According to William, he met Maryann in early 1978, while they were working in Arizona.  Maryann was 18 years old and William was 28 years old.  Maryann and William married in Arizona in April of 1978.  The couple flew to Hawai'i in June 1978. William brought a ".38 Special" handgun and a hunting knife with him to Hawai'i.  William and Maryann stayed at the Makiki Arms apartment.  Neither Maryann nor William worked, and they ran out of money.  They came up with a plan to "sell bunk marijuana to

10

tourists." The plan involved Maryann "get[ting] dolled up" and approaching men in Waikīkī bars to identify their prospective targets.

On June 10, 1978, Maryann met Joe Leach at the Garden Bar at the Hilton Hawaiian Village hotel. Leach bought drinks for Maryann. William was introduced to Leach as Maryann's brother. Leach was not their preferred target because he was local and not a tourist. Nevertheless, after determining that Leach was not interested in buying marijuana, William and Maryann decided to rob him. Leach, Maryann, and William left the bar in Leach's car. While Leach was driving, William "pulled the gun" on Leach, cocked the trigger, and told Leach that he was being robbed. William instructed Leach to give his wallet to Maryann, and Leach complied.

William directed Leach to drive to Hanauma Bay. At Hanauma Bay, they all got out of the car. William tied Leach up using Maryann's pantyhose while Maryann held the gun, and they left Leach bound and gagged. William and Maryann drove away in Leach's car, went to their apartment, and took a camera, a tape deck, and cigarettes from the car. William left the car next to a nearby park, and he called Leach's workplace to report that Leach was at Hanauma Bay. Maryann pawned items they had taken from Leach's car.

On June 19, 1978, Maryann got "dolled up," and she and William again went to the Garden Bar. Maryann talked to Larry Hasker. According to William, he got the impression that Hasker was a drug dealer. William wanted Maryann to get rid of Hasker because he was not a tourist, but Maryann wanted to "take" Hasker because she thought he was a dealer and had "big money[.]" William and Maryann left the Garden Bar, but they later ran into Hasker at a different bar.

Hasker gave William and Maryann a ride home in Hasker's car, and Hasker accompanied them into their Makiki Arms apartment. In the apartment, Maryann again told William that she wanted to rob Hasker. William pulled the gun on Hasker and said,

11

"This is a robbery, man." Hasker was tied up and Maryann drove the three of them in Hasker's car to Hasker's apartment. William gave the gun to Maryann and told her to go into the apartment to look for money and cocaine, while William remained in the car with Hasker. Maryann returned with money and a marijuana cigarette, but no cocaine. When Maryann returned after a second search of the apartment, she drove them to Hanauma Bay.

At Hanauma Bay, Hasker and Maryann got out of the car, and Maryann was holding the gun on Hasker. Hasker asked to use the bathroom. After urinating, Hasker turned toward Maryann. According to William, Maryann then shot the gun at Hasker three times from a distance of ten to fifteen feet. William did not know that Maryann was going to shoot Hasker, and William did not intend for Hasker to die. After they drove home, William told Maryann to get rid of the car, and she did so. William initially planned to leave Hawai'i without Maryann, but they eventually agreed to "fly back together." William denied threatening or forcing Maryann to participate in the incidents involving Leach and Hasker.

On cross-examination, Maryann's counsel asked William if he had "ever lie[d] under oath, commit[ted] perjury, as it pertains to Maryann." After William responded "Yeah I --", the prosecutor objected. At side bar, the State argued that the question "opens the door" to William's explaining his answer. The Circuit Court overruled the objection and allowed defense counsel to continue. When asked whether he had "ever committed perjury as it pertains to Maryann," William responded that he had "never lied in court." When asked if he had "ever lied under oath as it pertains to Maryann," William asked the trial judge, "Your Honor, does a board hearing count?" The trial judge responded, "If its under oath, yes. . . . I assume we are talking about a California board hearing; isn't that right?"

A side bar was held, and the Circuit Court decided to strike the preceding series of questions and answers relating to perjury pending the opportunity for a more thorough hearing.

Defense counsel opposed the striking of the testimony, arguing that "[y]ou can just tell me to stop going any further, but I don't think you should strike it right now because I am entitled to open the door if I choose to open the door." The Circuit Court responded, "I'm going to strike it now, let you reinitiate it if need be." Defense counsel repeated that he was entitled to open the door, but claimed that he was "not going to open the door right now." The Circuit Court warned defense counsel, "But you are on the doorknob." The Circuit Court informed the jury that it was striking the preceding series of questions and answers about perjury and directed the jury to disregard it.

In resuming his cross-examination, defense counsel asked William about lying, and William admitted to lying sometimes, but not under oath. At side bar, defense counsel informed the Circuit Court that he planned to ask William "[i]f he's ever committed perjury, he's lied under oath." The Circuit Court told defense counsel that it "[s]ounds like you are going to open the door," and it permitted defense counsel to ask William about lying under oath. Upon resuming cross-examination, defense counsel and William went back and forth about William's understanding of the terms perjury and lying under oath. Defense counsel then elicited the following testimony:

> Q. My question to you, Mr. Acker, have you ever lied under oath as it pertains to anything about Maryann?
>
> A. Probably.
>
> Q. Probably. Does that mean yes?
>
> A. Yeah. That means yes.
>
> Q. Okay.
>
> A. But not in court.
>
> Q. And so when you lie -- I'm sorry. When you lied under oath about Maryann, was there any repercussion to you?
>
> A. No.
>
> Q. No.

13

A.    No, there wasn't because there wasn't a lie on her.  I'm trying to do something for her.

The trial then ended for the day.

The next day, the Circuit Court expressed its view that the door may have been opened to the Arauza matter: "It strikes me that the door may well have been opened for a variety of reasons to the California situation, either under the rule of completeness or the rule of relevance and under Rule 611."  After discussion with the State and Maryann, the Circuit Court ruled that "[t]he door is open.  Once it's open, it's going to be completely open . . . to the entire Cesario Arauza -- not about the incident, certainly the convictions.  Because [the jurors] are going to need to have a context by which to operate."

Based on the Circuit Court's ruling, the California judgments of Maryann and William were admitted in evidence.  The Circuit Court also gave the following limiting instruction to the jury:

> [Y]ou are about to hear evidence that the defendant and the witness at another time may have or have engaged in and committed other crimes, wrongs or acts.  You must not use this evidence to determine that the defendant or the witness are persons of bad character and, therefore, must have committed the offense charged in this case.

> Actually, I'm talking only about [Maryann], the defendant is a person of bad character and must have committed the offense charged in this case.  Such evidence may be considered by you only on the issue of the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, modis operandi, absence of mistake or accident, and for no other purpose.

> So it doesn't go to propensity or character.  It goes to the specific reasons detailed in our statute and the rules.

Defense counsel subsequently questioned William about his 1991 statements to the California Parole Board.  William admitted that he had stated under oath that he had committed the murder of Cesario Arauza for which he was in custody; that he had pulled the trigger in the Arauza case; that he had also "committed the one in Hawaii"; and that Maryann had done "[a]bsolutely nothing" and deserved to be free.

14

On redirect examination, William explained that he had lied under oath to the California Parole Board "to try to free Maryann." William testified that he admitted to shooting Arauza and Hasker because some "student lawyers" from UCLA representing Maryann had "told me that I could free her. She could go home if I said these things to the board."

William testified that after Maryann shot Hasker, William and Maryann caught a flight to California on June 20, 1978. Between June 24, and June 25, 1978, Arauza was murdered. Arauza had given William and Maryann a ride. At one point, Maryann drove off with Arauza, leaving William behind. When Maryann came back, Arauza was not with her, and Maryann told William that she had left Arauza on an on-ramp. William did not learn that Maryann had shot Arauza until Maryann disclosed this to William after she had already been found guilty of Arauza's murder.

Over Maryann's objection, William also testified about California robberies that he and Maryann had committed shortly after Arauza's murder. The State argued that Maryann's California robberies were relevant and admissible to rebut her claim that she was forced to participate with William in committing crimes and had no opportunity to get away from him. William testified that he committed two robberies after the murder of Arauza and that Maryann participated in both of them. William also stated that Maryann committed a third robbery on June 26, 1978, by herself. Maryann was arrested after she had left the motel where she and William were staying to "get rid" of Arauza's car. William saw Maryann in police custody and left the motel. William later turned himself in to the police on July 1, 1978.

3.

Arauza's cause of death was two gunshot wounds to the head. The four bullets recovered from the bodies of Hasker and Arauza were fired from the same .38 caliber revolver. Maryann was arrested on June 28, 1978, in Long Beach, California. She

was the driver and sole occupant of a Chevy Blazer registered to Arauza. .38 caliber revolver rounds were found in the motel room where Maryann had been staying.

Los Angeles County Deputy Sheriff Wilbert Ahn (Sheriff Ahn) was assigned to investigate the murder of Arauza. From 1978 to 1980, Ahn had contact with William approximately fifty to seventy-five times, on an official basis.

Portions of Leach's testimony at Maryann's first trial was read to the jury. Leach had testified that on June 9, 1978, while he was in the Garden Bar, a woman approached him and asked if she could join him. After they talked and danced, the woman introduced him to a male and asked Leach if he could give the male a ride home. While Leach was driving, the male pointed a pistol at Leach, told Leach to give the woman his wallet, and directed Leach to drive to Hanauma Bay. The woman checked Leach's glove box. At Hanauma Bay, they got out of the car, the woman used her pantyhose to tie Leach's hands behind his back, and then the woman held a gun on Leach while the male gagged Leach and retied Leach's hands more tightly with the pantyhose. At one point, Leach turned and looked at the woman. The woman was pointing the gun at Leach and told him to turn back around. The woman and male drove away in Leach's car.

4.

Maryann testified in her own defense at trial. Maryann testified that she met William in March 1978, and he moved in about a month later. William wanted to get married, and because he was persistent, Maryann agreed. While living in Arizona, William broke into a neighbor's house and stole a .38 caliber revolver. It was William's idea to come to Hawai'i for a "delayed honeymoon." Maryann bought round-trip tickets, and they came to Hawai'i in June 1978. William brought the handgun and a knife with him. William wanted to stay in Hawai'i, so they cashed in the return-trip tickets.

According to Maryann, William did not want her to work and he was unable to get a job, so William "started talking about

this plan that he was developing to rob tourists[.]" Maryann did not want to rob tourists and opposed William's plan. However, she ultimately agreed to help William because he started threatening her by holding the gun to her head or ribs and telling her that she "would do what he said." This terrified Maryann. On one occasion, when Maryann was arguing with William about his plan, William aimed and fired the gun at Maryann inside their Makiki Arms apartment. Maryann became "[e]ven more scared," and she "believed his threats that if [she] went against him, he would hurt [her]."

It was William's idea to go to the Hilton Hawaiian Village Garden Bar. William directed Maryann to talk to Leach. They eventually all left in Leach's car. William pulled a gun on Leach and told him it was a robbery. At William's direction, Leach gave his wallet to Maryann and drove to Hanauma Bay. William instructed Maryann to give him her pantyhose, and then he walked Leach down an embankment. Maryann tied Leach's hands with the pantyhose, "because [William] told [her] to." William later retied Leach's hands, while Maryann held the gun. William and Maryann took Leach's car, left Leach tied up at Hanauma Bay, and drove back to their Makiki Arms apartment. William and Maryann took items from Leach's car, and William had Maryann pawn the items.

A few days later, William wanted to rob someone else. Although Maryann did not want to commit another robbery, she got dressed up and ready to repeat the plan. They went back to the Garden Bar, where Maryann met Hasker. William told Maryann he wanted to rob Hasker. Maryann tried to talk William out of it, and he agreed to leave the bar. At another bar, Hasker unexpectedly showed up and bought them drinks. William did not discuss with Maryann what he wanted to do with Hasker. William asked Hasker for a ride back to the Makiki Arms apartment, and Hasker agreed. William invited Hasker inside, and William pulled Maryann aside to tell her that he wanted to rob Hasker. Maryann tried to talk William out of it again, but he pulled the gun on

Hasker and said it was a robbery. Maryann drove the three of them to Hasker's apartment. William told Maryann to go into the apartment and look for money and drugs. Maryann did not want to burglarize Hasker's apartment, but she complied with William's instructions to go into the apartment. Maryann returned to the car with money, but no drugs. William told her to go back to look for cocaine. Maryann went into the apartment again, but did not find any cocaine.

With Maryann driving, they went in Hasker's car to Hanauma Bay. Maryann pulled over to the side of the road, and William and Hasker got out of the car. William and Hasker walked down an embankment out of Maryann's sight. Maryann heard two gunshots, but did not see or know what had happened. When William came back to the car, Maryann asked him what had happened. William told her, "[D]on't worry about it. It's just something I had to do. You wouldn't understand. Let's go get something to eat." Maryann testified that she did not know that Hasker was going to be shot and killed, she did not intend for it to happen, and she did not help anyone cause it to happen. They drove back to their apartment, where William made flight reservations.

They flew together to Los Angeles that same day. They hitchhiked to Merced and stayed a couple of days. While hitchhiking back to Los Angeles, Arauza picked them up in a Chevy Blazer. During the ride, William pulled the gun on Arauza and told Arauza to pull over. William told Arauza to get out of the car, and William and Arauza walked down an embankment out of Maryann's line of sight, just as William did with Hasker. Maryann heard two gunshots. William walked back to the vehicle and told her "it was just something he had to do and [she] wouldn't understand," the same thing he said with Hasker. They drove to Los Angeles, where they participated in other robberies. Maryann was arrested by herself, while driving Arauza's Chevy Blazer. Maryann denied knowing that Arauza was going to be shot

18

and killed, and she stated that she did not want it to happen and did not help cause it to happen.

Maryann testified that she had never been represented by law students from UCLA, but had been represented by law students from the University of Southern California. The University of Southern California law students started to represent her in 1995, which was after William's 1991 statements to the California Parole Board.

On cross-examination, Maryann acknowledged that after the Arauza incident, she committed three robberies. Two of the robberies were with William. She committed the third robbery by herself, during which she entered a store, pulled out a gun, and demanded money. Maryann also acknowledged that after she and William had been arrested and charged in California, Maryann sent "love letters" to William.

5.

Maryann attempted to recall William as a witness in her case (1) to explain why Sheriff Ahn met with William over fifty times and (2) to question William about his testimony that law students from UCLA contacted him and told him to take responsibility for shooting Hasker and Arauza so Maryann would get out of prison. Pursuant to a subpoena, William was transported to the courthouse and held in the cellblock. William knew he had been subpoenaed, but claimed that testifying in the defense case would jeopardize his safety. The sheriffs had an extraction process, taking one to two hours, that could be used to remove William from his cell and bring him into the courtroom. Maryann asked that William be extracted, but the Circuit Court refused the request because it did not believe "there would be any gain and it would be -- just wouldn't work and wouldn't be helpful for the jury." Maryann was permitted to call a deputy sheriff to testify that William was subpoenaed, transported to the courthouse, and told that there was a lawful court order requiring him to appear and testify, but that William refused to come to the courtroom and testify.

6.

The jury found Maryann guilty as charged of murder, but by special interrogatory found that the State did not prove beyond a reasonable doubt "that [Maryann] actually possessed, used, or threatened to use a pistol during the commission of the Murder[.]" The Circuit Court sentenced Maryann to life in prison with the possibility of parole and entered its Judgment on November 9, 2009. This appeal followed.[5/]

DISCUSSION

I.

Maryann argues that the Circuit Court erred in ruling that her cross-examination of William about his statements to the California Parole Board opened the door to "bad act" evidence regarding the Arauza incident. We disagree.

William's statements to the California Parole Board that he had been the shooter in the Hasker murder and that Maryann did "nothing," was strong evidence in favor of Maryann. William's statements provided direct support for Maryann's defense that she did not shoot Hasker and had not intentionally participated in his murder. The statements also served to impeach William's trial testimony that Maryann had shot and killed Hasker. However, eliciting evidence of William's statements came with risks because it opened the door to the State being allowed to have William explain the context of and his motivation for the statements. The context of William's statements was that both he and Maryann were in prison for the Arauza murder. The motivation for the statements, according to William, was that he had been told by Maryann's student lawyers that she would be released on parole if he took responsibility for being the shooter, so he falsely said he was the shooter. William testified that Maryann had not been released after his

_____

[5/] On August 8, 2012, the court granted Maryann's motion for retention of oral argument, and oral argument was held on August 31, 2012.

20

statements, which William said was why he had reverted to telling the truth about the incidents.

The record does not support Maryann's contention that the Circuit Court had ruled that defense counsel could question William in the manner he did without opening the door to the Arauza matter. The record shows that both prior to trial and during trial, the Circuit Court warned defense counsel that he risked opening the door to the Arauza incident by cross-examining William about his statements to the California Parole Board. We conclude that defense counsel's questions to William about whether he had ever lied under oath as it pertains to anything about Maryann, and whether that lie under oath had any repercussion to him, was a clear reference to William's statements to the California Parole Board. The Circuit Court did not abuse its discretion in ruling that these questions opened the door to William explaining why he lied under oath and to evidence of the Arauza incident. See State v. Viernes, 92 Hawai'i 130, 133, 988 P.2d 195, 198 (1999) (noting that evidentiary rulings, "which require 'judgment calls' on the part of a trial judge," are reviewed for abuse of discretion); Green v. State, 831 S.W.2d 89, 94-95 (Tex. Ct. App. 1992) (stating that when the defendant opens the door, "the State is permitted to complete the picture by presenting evidence that would otherwise have been inadmissible"); Credille v. State, 925 S.W.2d 112, 116 (Tex. Ct. App. 1996) (applying Texas evidentiary rule permitting "the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter 'opened up' by the adverse party"); State v. Malshuk, 857 A.2d 282, 286 (Vt. 2004) (stating that where defense counsel attempts to impeach a witness's credibility by painting an incomplete picture, "the State may complete the picture with 'appropriate detail'"); see also State v. Brooks, 125 Hawai'i 462, 469-74, 264 P.3d 40, 47-52 (App. 2011) (applying rule of completeness to permit introduction of evidence that would otherwise be inadmissible where necessary to prevent misleading the jury).

We also reject Maryann's claim that evidence regarding the Arauza incident was irrelevant and inadmissible under Hawaii Rules of Evidence (HRE) Rule 404(b) (Supp. 2011). The Arauza incident was relevant to providing a context and explanation for William's statements to the California Parole Board. It was also relevant to show Maryann's intent, motive, plan, and preparation, including the nature of the her relationship with William; to refute Maryann's claim that it was William who orchestrated and forced her to participate in criminal activity; and to show that she was an intentional and willing participant in Hasker's murder. In opening statement, Maryann's counsel stated that William had struck fear into Maryann by shooting at her to get her to participate in his plan to commit robberies; that William pressured Maryann, and she felt forced to go along with William; and that she did not shoot or kill Hakser, did not intend for that to happen, and did not know it would happen. The evidence of the Arauza incident supported the State's contention that Maryann was an intentional and willing participant in William's criminal activity and was a principal or accomplice in Hasker's murder. It also showed that Maryann had opportunities to leave and disassociate herself from William, but chose to remain with him. See State v. Clark, 83 Hawai'i 289, 300-01, 926 P.2d 194, 205-06 (1996) (concluding that prior incidents of domestic violence was admissible under HRE Rule 404(b) to show the context of the relationship between the defendant and the alleged victim); State v. Iaukea, 56 Haw. 343, 348-54, 537 P.2d 724, 729-32 (1975) (concluding that evidence of the defendant's prior crimes, which explained and placed in context the complaining witness's statements and actions, was admissible); United States v. Zackson, 12 F.3d 1178, 1182-82 (2d Cir. 1993) (holding that evidence of the defendant's prior similar crime was admissible under federal counterpart to HRE Rule 404(b) to prove the defendant's criminal intent); United States v. Ceballos, 605 F.3d 468, 469-71 (8th Cir. 2010) (concluding that evidence of prior

similar crimes was admissible under federal counterpart to HRE Rule 404(b) to rebut the defendant's claim of coercion).

The same analysis applies to the evidence of Maryann's three robberies in California. Evidence of these robberies supported the State's contention that Maryann was a partner in crime with William and not an unwilling participant. It also provided insight into her intent, motive, and plan, as well as their relationship, by showing that she was capable of committing a robbery on her own.

Maryann benefitted through her cross-examination of William about his statements to the California Parole Board. It permitted her to introduce a specific admission by William that he had been the shooter for the Hasker murder in Hawai'i. It also permitted defense counsel to mount a strong attack on William's credibility.

Before the jury heard evidence regarding the California incidents, the Circuit Court gave them a limiting instruction to ensure that the evidence would only be considered for its proper purpose. The limiting instruction alleviated the risk of unfair prejudice, as a jury is presumed to follow the trial court's instructions. State v. Knight, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996).

Given Maryann's actions in opening the door to the Arauza incident through her cross-examination of William, the relevancy of the California incidents, and the limiting instruction given by the Circuit Court, we cannot say that the Circuit Court abused its discretion in permitting the challenged evidence.

## II.

Maryann argues that the testimony of Millard, Hasker's friend, concerning a police request that Millard take a lie detector test was an "evidentiary harpoon" requiring a mistrial. See State v. Kahinu, 53 Haw. 536, 549, 498 P.2d 635, 643-44

(1972).[6/] We disagree. Millard testified that he and Hasker had made plans to meet on June 19, 1978, but the two did not meet as planned. A few days later, Millard was contacted by the Honolulu Police Department. Millard testified that "[t]hey asked me if I would take a lie detector test, asked me a lot of questions like where were you and all this and all that. And apparently, you know, I answered all the questions and everything to their liking."

At Maryann's request, the Circuit Court struck Millard's testimony regarding the lie detector test as "irrelevant and inadmissible" and instructed the jury to disregard it. Despite the striking of Millard's testimony, Maryann later moved for a mistrial. Maryann's contention was that based on Millard's testimony, the jury would think the police were asking everyone who was a possible suspect to take a lie detector test, including William; that the State gave "a deal" to William; and therefore, the jury would infer that William must have passed a lie detector test.

As the Circuit Court noted, Millard was an ancillary witness. Moreover, it is not apparent that the multiple inferences argued by Maryann would be drawn by the jury. We conclude that the Circuit Court did not abuse its discretion in concluding that striking Millard's testimony and directing the jury to disregard it was sufficient to protect Maryann's right to a fair trial and in denying Maryann's motion for mistrial on that basis.

---

[6/] In Kahinu, a police detective made gratuitous references to Kahinu being in police custody on another case. Kahinu, 53 Haw. at 548-49, 498 P.2d at 643-44. The Hawai'i Supreme Court stated that "the deliberate and unresponsive injection by prosecution witnesses of irrelevant references to [a defendant's] prior arrests, convictions or imprisonment" could constitute an "evidential harpoon" requiring the declaration of a mistrial. Id. at 549, 498 P.2d at 643-44. The court ultimately held that the detective's improper references were harmless and did not contribute to Kahinu's guilty verdicts. Id. at 549, 498 P.2d at 644.

24

III.

Citing State v. Greyson, 70 Haw. 227, 768 P.2d 759 (1989), Maryann contends that the prosecutor improperly cross-examined her by using information in her Hawai'i presentence report. In Greyson, the Hawai'i Supreme Court determined that presentence reports were confidential under HRS § 806-73 (1985) and that the State could not use Greyson's statement contained in his presentence report to impeach him. Id. at 232-35, 768 P.2d at 762-64. We agree that the prosecutor's use of the presentence report was improper under Greyson, but conclude that the error was harmless.

The prosecutor used Maryann's Hawai'i presentence report to question her about how soon she moved in with William after meeting him. The prosecutor also asked if seeing a statement she made that was in the presentence report would refresh her recollection about whether William gave her the gun to hold on Hasker while at the Makiki Arms apartment. At this point, Maryann objected, and the Circuit Court struck the testimony related to the State's use of the Hawai'i presentence report and instructed the jury to disregard it. We conclude that the State's references to the presentence report did not result in any significant prejudice to Maryann and did not affect her substantial rights.

IV.

Maryann argues that the Circuit Court mishandled William's refusal to testify, when he was recalled in the defense case, in a manner that denied her a fair trial. Maryann argues that she wanted to recall William to further impeach his credibility by questioning him about his interviews with Sheriff Ahn and his claim that his 1991 statements to the California Parole Board were prompted by his being contacted by Maryann's student lawyers. Maryann contends that the Circuit Court should have done more to require William to testify, such as order that he be extracted from the cellblock and brought to the courtroom, personally address William to order him to testify, and advise

25

William of the consequences for his refusal. We conclude that the Circuit Court did not abuse its discretion in responding to William's refusal to testify.

Although Maryann asked that William be extracted and forced to appear in court, the Circuit Court, based on its understanding of the circumstances, did not believe there would be "any gain" in doing so, and that "[it] just wouldn't work and wouldn't be helpful for the jury." Instead, the Circuit Court permitted Maryann to elicit testimony from a deputy sheriff that William had been subpoenaed, transported to the courthouse, and told that there was a lawful court order requiring him to appear and testify, but that William refused to go into the courtroom and testify. We cannot say that the Circuit Court erred in the manner it chose to handle William's refusal to appear.

William was cross-examined thoroughly over a period of three days and his credibility was subject to extensive impeachment. During cross-examination of William, Maryann elicited the following information: William would lie in order to obtain favorable treatment; William received a favorable plea agreement from the State of Hawai'i; there was no objective way to determine if William was telling the truth; William lied to Sheriff Ahn; William is a convict and convicts don't tell the truth; when William talks to police, it is usually to improve his legal situation; and William lies to the police, prosecutors, and parole commissioners. Maryann also elicited testimony that William stated, under oath, to the California Parole Board that he was the shooter in the Hasker and Arauza murders, and that Maryann had nothing to do with those killings. Furthermore, Maryann was able to attack William's credibility based on his refusal to testify because the Circuit Court permitted Maryann to adduce evidence that William had been subpoenaed and brought to the courthouse, but had refused to appear for additional questioning.

There was ample testimony and information through which the jury could "gauge adequately" William's credibility and "to

26

assess his . . . motives or possible bias." <u>See</u> <u>State v. Balisbisana</u>, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996) (internal quotation marks and citation omitted). We conclude that the manner in which the Circuit Court handled William's refusal to be recalled as a witness in the defense case did not deprive Maryann of a fair trial.

V.

Maryann argues that the prosecutor engaged in misconduct that violated her right to a fair trial by arguing in rebuttal closing that William did not ask for anything or get anything. We disagree.

During his rebuttal closing argument, the prosecutor stated:

> [W]hen William Acker was shown Maryann Acker's judgment on the stand, that was the first time he had ever seen it. He did not know that she had her use allegation stricken. And recall, the conviction happened in January. William Acker didn't say anything to Wilbert Ahn until March, after he had that meeting with [Maryann] on the bus from court, where she said, "Have you snapped? I killed Cesario Arauza."

> And at that point, he just gave up, ladies and gentlemen. He pled nolo contendere, no contest. It's not an admission, but the Court did find him guilty of everything charged. There was no trial, no admission, but he just gave up. He didn't ask for anything. He didn't get anything. He's still in custody today.

The prosecutor's reference to William not asking for or getting anything was in the context of his plea to the California charges. William pleaded nolo contendere to all counts with which he was charged in the California case, including the murder of Arauza with the use of firearm allegation.[2/] There was basis in the evidence for the prosecutor's argument. <u>See</u> <u>Clark</u>, 83 Hawai'i at 304, 926 P.2d at 209. In addition, it was clear from the evidence that William had asked for and received substantial benefit in his plea agreement regarding the Hawai'i charges,

---

[2/] William's California judgment was admitted in evidence. William acknowledged that he had pleaded nolo contendere to the murder of Arauza and the use of firearm allegation, although he testified that when the plea was entered, he thought he was pleading to felony murder.

including all counts except one robbery count being dismissed and William being granted transactional immunity for his testimony. The prosecutor's argument did not mislead the jury or violate Maryann's right to a fair trial.

VI.

Maryann argues that the Circuit Court's jury instructions regarding the offense of murder and accomplice liability were erroneous. In particular, Maryann contends that because the indictment charged her with intentionally or knowingly causing Hasker's death "by shooting him with a firearm," she could only be convicted as a principal, and not as an accomplice. She argues that the instruction on the offense of murder should have required proof that she caused Hasker's death by shooting him with a firearm[8] and that the Circuit Court should not have given an accomplice liability instruction. We disagree.

It is well established that "one who is charged as a principal can be convicted as an accomplice without accomplice allegations being made in the indictment." State v. Fukusaku, 85 Hawai'i 462, 486, 946 P.2d 32, 56 (1997) (internal quotation marks and citation omitted). Accordingly, it was not error for the Circuit Court to instruct the jury that Maryann could be convicted of murder as an accomplice.

The inclusion of the firearm language in the indictment was appropriate to give Maryann fair notice that she was subject to a mandatory minimum sentence if she was convicted as a principal. See State v. Apao 59 Haw. 625, 635-36, 586 P.2d 250, 257-58 (1978). In the special interrogatory regarding the enhanced mandatory minimum penalty for use of a firearm, the jury found that the State failed to prove that Maryann "actually possessed, used, or threatened to use a pistol" during the

---

[8] The Circuit Court's offense-of-murder jury instruction required the State to prove, in relevant part, that Maryann (1) "intentionally or knowingly engaged in conduct"; and (2) "[t]hat by engaging in that conduct, [Maryann] intentionally or knowingly caused the death of Lawrence R. Hasker."

28

commission of the charged murder. The jury's rejection of the firearm enhancement makes clear that the jury convicted Maryann as an accomplice, and not as a principal. Because Maryann was not convicted as a principal, adding a requirement in the offense-of-murder jury instruction that Hasker's death was caused by his being shot with a firearm would not have affected the outcome of the case. See Fukusaku, 85 Hawai'i at 487-90, 946 P.2d at 57-60.

## CONCLUSION

For the foregoing reasons, we affirm the Circuit Court's Judgment.

DATED: Honolulu, Hawai'i, October 12, 2012.

Keith S. Shigetomi
for Defendant-Appellant

Brandon H. Ito
(Delanie D. Prescott-Tate
with him on the brief)
Deputy Prosecuting Attorneys
City and County of Honolulu
for Plaintiff-Appellee

Craig H. Nakamura
Chief Judge

Associate Judge

Lawrence M. Reifurth
Associate Judge